Concurring opinion filed by Circuit Judge Reyna.
O'Malley, Circuit Judge.
This appeal arises from three inter partes reviews ("IPRs") challenging claims of two patents owned by Appellant Applications in Internet Time, LLC ("AIT"): U.S. Patent Nos. 7,356,482 ("the '482 patent") and 8,484,111 ("the '111 patent"). The Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("PTO") instituted the IPRs over AIT's objection that the three IPR petitions filed by Appellee RPX Corporation ("RPX") were time-barred under 35 U.S.C. § 315(b) (2012). AIT contended that RPX was acting as a "proxy" for one of its clients, Salesforce.com, Inc. ("Salesforce"), on whom AIT had served a complaint alleging infringement of the '482 and '111 patents more than one year before RPX filed its petitions. Thus, AIT alleged that *1339 RPX was not the only real party in interest and that the time bar applicable to Salesforce was equally applicable to RPX. In two final written decisions, the Board held certain claims of the patents unpatentable under 35 U.S.C. § 103. RPX Corp. v. Applications in Internet Time, LLC , Nos. IPR2015-01751, IPR2015-01752, 2016 WL 7985456 (P.T.A.B. Dec. 28, 2016) ( 482 Decision ); RPX Corp. v. Applications in Internet Time, LLC , No. IPR2015-01750, 2016 WL 7991300 (P.T.A.B. Dec. 28, 2016) ( 111 Decision ).
AIT appeals, among other things, the Board's time-bar and unpatentability determinations. For the reasons set forth below, we conclude that the Board applied an unduly restrictive test for determining whether a person or entity is a "real party in interest" within the meaning of § 315(b) and failed to consider the entirety of the evidentiary record in assessing whether § 315(b) barred institution of these IPRs. We accordingly vacate the Board's final written decisions and remand for further proceedings.
I. BACKGROUND
A. The Salesforce Litigation and Failed Covered Business Method Petitions
Salesforce is a software company that offers customer relationship management software to its clients. On November 8, 2013, AIT filed a complaint against Salesforce, asserting infringement of both patents. See Compl., Applications in Internet Time, LLC v. Salesforce.com, Inc. , No. 3:13-cv-00628 (D. Nev. Nov. 8, 2013), ECF No. 1. Salesforce was served with a copy of the complaint on November 20, 2013.
As the district court noted, Salesforce's "right to file a petition with the PTAB seeking [IPR] of the patents in suit expired in November 2014" under 35 U.S.C. § 315(b). Id. Rather than timely petition for IPR of the '482 and '111 patents, Salesforce filed petitions for covered business method ("CBM") review in August 2014. Applications in Internet Time, LLC v. Salesforce.com, Inc. , No. 3:13-cv-00628, 2015 WL 8041794, at *1 (D. Nev. Dec. 4, 2015). The Board denied both CBM petitions in February 2015, concluding that Salesforce failed to establish that the patents are "covered business method patent[s]" within the meaning of the AIA. Salesforce.com, Inc. v. Applications in Internet Time LLC , No. CBM2014-00168, 2015 WL 470747, at *6 (P.T.A.B. Feb. 2, 2015) ; Salesforce.com, Inc. v. Applications in Internet Time LLC , No. CBM2014-00162, 2015 WL 470746, at *7 (P.T.A.B. Feb. 2, 2015).
B. RPX's IPR Petitions and Pre-Institution Discovery
RPX is a public company whose stated "mission is to transform the patent market by establishing RPX as the essential intermediary between patent owners and operating companies." J.A. 31. One of its strategies is "to help members of [its] client network quickly and cost-effectively extricate themselves from [non-practicing entity ('NPE') ] lawsuits." J.A. 29. Salesforce is one of RPX's clients.
On August 17, 2015-more than one year after Salesforce was served with copies of AIT's complaint in the Salesforce litigation and several months after Salesforce's CBM petitions were denied-RPX filed three IPR petitions challenging the patentability of claims of the '482 and '111 patents. In each petition, RPX identified itself as the "sole real party-in-interest," and certified that it is not barred or estopped from requesting IPR as to the '482 and '111 patent claims. Moreover, in each petition, RPX acknowledged that the outcome of the IPRs could impact the ongoing Salesforce litigation.
Shortly thereafter, AIT filed motions for additional discovery, in which it asked the *1340 Board to compel RPX to produce documents relevant to identifying the real parties in interest. AIT "expect[ed] that the requested discovery, together with additional information, will make a compelling showing that RPX is the agent of un-named third party Salesforce.com, Inc. (Salesforce), thus establishing that the petitions are time-barred under 35 U.S.C. § 315(b)." J.A. 17. RPX opposed the motions. The Board, relying on passages in the PTO's Patent Trial Practice Guide, 77 Fed. Reg. 48,756 (Aug. 14, 2012) ("Trial Practice Guide"), was "persuaded that the combination of factors present here justifie[d] permitting additional discovery on the issue of whether Salesforce is a" real party in interest, and granted in part AIT's motions. J.A. 1068-69.
Over the following weeks, RPX produced documents responsive to certain of AIT's discovery requests. Among these documents are webpages that reveal, among other things, that (1) RPX "is the leading provider of patent risk solutions, offering defensive buying, acquisition syndication, patent intelligence, insurance services, and advisory services," id. at 73; (2) its "interests are 100% aligned with those of [their] clients," id. at 71; (3) RPX "work[s] to ensure that each RPX client avoids more in legal costs and settlements each year than they pay RPX in subscription fees," id. ; and (4) although RPX "prevent[s] patent litigation," it also "can help after a litigation has begun," id. at 72. Another webpage, titled "Client Relations," provides that the company has teams that "vet each possible asset for quality, assertion history, seller reputation, and-especially-likelihood of threat to any or all RPX members." Id. at 28. This same webpage states that RPX's "insight into the patent market allows [it] to serve as an extension of a client's in-house legal team to better inform its long-term IP strategy." Id. Also among the documents produced were RPX's Form 10-K annual report for the period ending December 31, 2013, which lists one of RPX's "[s]trateg[ies]" as "facilitati[ng] ... challenges to patent validity...." Id. at 30-31. Other documents reveal that RPX and Salesforce share a member on their respective boards of directors. Id. at 32-36.
In addition to the foregoing, RPX produced three documents containing confidential information that are relevant to this appeal. The first, titled "Validity Challenge Identification Process and Best Practices" ("Best Practices Guide"), sets forth the company's "best practices" for identifying patents whose validity it will challenge in an IPR. Id. at 80-81. The document, which was created on July 9, 2014, id. at 1227 ¶ 14, provides that "RPX best practices help ensure that RPX is complying with all contractual obligations and to ensure that RPX is and will be deemed by the PTAB and district courts as the sole real party-in-interest in all validity challenges unless another real party-in-interest is expressly identified." Id. at 80. RPX's best practices (1) expressly discourage the company from taking suggestions from third parties, including clients, regarding validity challenges; (2) provide that it will not discuss forthcoming validity challenges with third parties in advance of filing; and (3) mandate that RPX will not discuss strategy or take feedback on pending validity challenges, and will "maintain complete control of all aspects of pending validity challenges." Id. This document further explains that "[a] validity challenge identification team ... will identify potential validity challenges to propose to the Validity Challenge Approval Committee," and "will identify potential candidates based, in part, on" multiple factors. Id. at 80-81.
The second document is a declaration from RPX's Vice President of Client Relations, William W. Chuang, in which *1341 Chuang testified as to the reasons RPX files IPRs, the process that led to RPX's filing of the IPR petitions in this case, and RPX's interactions with Salesforce. Chuang testified that "RPX has many reasons for filing IPR petitions," including (1) reducing patent risk to an industry of companies, including current and potential clients; (2) decreasing the number of plainly invalid patents, which undermines confidence in the general patent market and might cause current and prospective clients to question whether they should pay subscription fees to RPX; (3) providing leverage in negotiating reasonable prices for acquiring patent rights and removing them from the hands of NPEs; and (4) conveying to the industry that RPX, unlike certain of its competitors, "uses every available method to reduce patent risk efficiently." J.A. 1223-26 ¶¶ 5-10.
Chuang also averred that RPX followed its Best Practices Guide in deciding to file the three IPR petitions in this case, and that it accordingly "had no communication with Salesforce whatsoever regarding the filing of IPR petitions against the AIT Patents before the AIT IPRs were filed." J.A. 1229 ¶ 20. He testified that "RPX originally looked at the AIT Patents after the AIT-Salesforce Litigation was filed" pursuant to its "customary practice" of monitoring newly filed patent infringement lawsuits to identify suits brought by NPEs. J.A. 1235 ¶¶ 35-36. According to Chuang, RPX "most likely" identified the '482 and '111 patents as "good potential IPR candidates that aligned well with the selection criteria" set forth in the Best Practices Guide during a meeting held on February 20, 2015-just after Salesforce's CBM petitions were denied. J.A. 1236-37 ¶¶ 37-40.
Chuang further testified regarding "six communications between RPX and Salesforce employees in which the AIT-Salesforce Litigation and/or the AIT Patents were mentioned or discussed." J.A. 1230 ¶ 22. The first of these communications, initiated by RPX, occurred on January 7, 2014, during which Chuang "mentioned that RPX had become aware that Salesforce had been sued by AIT"; "provided a small amount of information" that RPX knew about the litigation; indicated that, although RPX did not have knowledge of AIT's expectations for its litigation campaign, it had previous dialogue on other matters with the same counsel who was representing AIT in the litigation; and offered to reach out to that counsel. J.A. 1231 ¶ 23. The following month, after Salesforce "had just renewed its membership agreement with RPX," an in-person meeting was held during which Salesforce "indicated that it would be interested if RPX could reach out to AIT and find out any information regarding AIT's expectations for its litigation campaign." J.A. 1231 ¶ 24. During a phone call on June 30, 2014, Salesforce "again indicated that it would be interested in any information RPX could obtain concerning AIT's expectations for its litigation campaign." J.A. 1232 ¶ 25. It does not appear that any contact between RPX and AIT's counsel occurred during that time period. J.A. 1231-32 ¶¶ 24-25.
Shortly after this third communication, Salesforce filed its CBM petitions. See Salesforce , 2015 WL 8041794, at *1. According to Chuang, RPX initiated a call to Salesforce approximately two weeks later, during which Salesforce informed RPX that it had filed the CBM petitions, that a stay would therefore be granted in the district court litigation, and that Salesforce no longer was interested in having RPX reach out to AIT to obtain information about AIT's expectations for that litigation. J.A. 1232 ¶ 26.
On March 11, 2015, approximately five weeks after the Board denied Salesforce's *1342 two CBM petitions, RPX again asked Salesforce during a phone call "if Salesforce would like RPX to reach out to AIT to try to obtain information regarding AIT's expectations for its litigation campaign in view of the fact that Salesforce's petition for CBM review had been denied." J.A. 1232 ¶ 27. According to Chuang, Salesforce indicated that it was not interested in having RPX reach out to AIT at that time, but would inform RPX if circumstances changed in the future. J.A. 1232-33 ¶ 27. Very shortly thereafter, however, in April or May 2015, "Salesforce began to bring up the subject of the AIT-Salesforce Litigation," but RPX, apparently experiencing a change of heart, "immediately indicated that it was not inclined to discuss that matter, and the topic of discussion turned elsewhere." J.A. 1233 ¶ 28.
The third document contains information regarding the terms of Salesforce's contractual arrangement with RPX. In relevant part, the document reveals that Salesforce has paid RPX substantial sums as membership fees since its membership began, including a very significant payment shortly before the IPR petitions at issue here were filed. J.A. 82.
After receiving and reviewing the aforementioned discovery, AIT filed preliminary responses in which it argued, among other things, that the IPRs could not be instituted because RPX failed to properly identify Salesforce as a real party in interest and because the petitions were time-barred. It noted the volume and timing of payments Salesforce had made to RPX and provided timelines plotting correspondence between Salesforce and RPX relating to the Salesforce litigation, the CBM proceedings, and the IPR proceedings. AIT did not, however, depose Chuang.
C. The Institution Decisions
The Board instituted IPRs over AIT's real party in interest challenges, which it construed as being premised on 35 U.S.C. § 312(a), 37 C.F.R. § 42.8(b)(1), and § 315(b). It acknowledged that both the '482 and '111 patents had been asserted against Salesforce, RPX's client, in district court, but concluded that AIT "ha[d] not provided persuasive evidence to support" its assertion that "RPX must have filed the [petitions] as a proxy for Salesforce" or that its "business model is built upon [RPX] acting as an agent or proxy for third parties in cases just like this." In reaching this conclusion, the Board articulated the legal standard as follows:
Whether an entity that is not named as a participant in a given proceeding constitutes [a real party in interest] is a highly fact-dependent question that takes into account how courts generally have used the terms to "describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012). According to the Trial Practice Guide,
the spirit of that formulation as to IPR ... proceedings means that, at a general level, the "real party-in-interest" is the party that desires review of the patent. Thus, the "real party-in-interest" may be the petitioner itself, and/or it may be the real party or parties at whose behest the petition has been filed.
Id. As stated in the Trial Practice Guide, there are "multiple factors relevant to the question of whether a non-party may be recognized as" an RPI. Id. (citing Taylor v. Sturgell , 553 U.S. 880, 893-895, 893 n.6, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) ). There is no "bright line test." Id. Considerations may include, for example, whether a non-party exercises control over a petitioner's participation in a proceeding, or whether a non-party is funding the proceeding or *1343 directing the proceeding. Id. at 48,759 -60.
A petition is presumed to identify accurately all RPIs. See Zerto, Inc. v. EMC Corp. , Case IPR2014-01295, slip op. at 6-7 (PTAB Mar. 3, 2015) (Paper 34). When a patent owner provides sufficient evidence prior to institution that reasonably brings into question the accuracy of a petitioner's identification of RPIs, the overall burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all RPIs. Id.
J.A. 1483-84.
The Board then wrote that several of AIT's citations to the record, including one in which RPX states its interests are "100% aligned" with those of its clients, were either taken out of context or mischaracterized. J.A. 1484. It juxtaposed those statements against other paragraphs in Chuang's declaration, including those in which he testified (1) that the "primary factor" driving RPX's decision to file the petitions was the ability to file a strong petition against a low-quality software patent "before the NPE extracted its price from its first litigation and proceeded to assert the patents more broadly against other targets," which would "provide significant reputational benefits to RPX"; and (2) that "RPX did not have any contractual obligation to file [this and the related] IPRs or any 'unwritten,' implicit or covert understanding with Salesforce that it would do so." J.A. 1485. The Board also rejected AIT's argument that "RPX has a history of acting as a proxy," distinguishing on their facts two of its earlier decisions on which AIT relied: RPX Corporation v. Virnetx Inc. , No. IPR2014-00171 (P.T.A.B. June 5, 2014), Paper No. 49, and RPX Corporation v. ParkerVision , No. IPR2014-00946 (P.T.A.B. Jan. 8, 2015), Paper No. 25. J.A. 1486.
The Board next disposed of AIT's argument that RPX has "adopted a 'willful blindness' strategy," under which "it intentionally operates its business to circumvent the [Board's] RPI case law," stating that it was "not persuaded that the evidence of record supports this assertion" and that RPX's declaration testimony "that explains RPX's 'best practices' for identifying RPIs ... contradicts [AIT's] assertion." J.A. 1487. The Board was likewise not persuaded by AIT's argument that Salesforce "advanced" RPX the cost of the petitions, finding this "conjecture without evidentiary support." J.A. 1487-88. Finally, the Board disagreed with AIT's assertion that timelines showing RPX's communications with Salesforce demonstrate "a clear pattern of conspiracy." The Board pointed to portions of Chuang's declaration in which he testified, without rebuttal, that, although RPX communicated with Salesforce regarding the Salesforce litigation, the CBM proceedings, offers to reach out to AIT, and requests for additional information from Salesforce, RPX did not communicate with Salesforce on the specific topic of the IPRs. J.A. 1489.
D. The Final Written Decisions
AIT filed a combined response to the IPR petitions, reiterating its belief that RPX was acting as a proxy for real party in interest Salesforce. RPX filed separate replies, and the Board held an oral hearing on December 7, 2016, during which AIT again raised its real-party-in-interest argument. At the hearing, AIT, for the first time, raised the possibility that RPX might be time-barred under § 315(b) as a "privy" of Salesforce, arguing that the statute "merely requires that the real party-in-interest or a privy be time barred without speaking of control." J.A. 2024.
In its final written decisions, the Board again rejected AIT's real-party-in-interest challenge and determined that all challenged claims are unpatentable as anticipated *1344 or obvious in view of certain prior art references. 482 Decision , 2016 WL 7985456, at *19 ; 111 Decision , 2016 WL 7991300, at *3, *15. AIT appeals from the final written decisions, arguing that the Board both "lacked authority to proceed in rendering the [decisions] because it misconstrued the law of privity and real party in interest" and erred in certain of its claim constructions and unpatentability determinations. J.A. 483-91.
II. DISCUSSION
The primary issue in this appeal is whether the Board relied on an erroneous understanding of the term "real party in interest" in determining that the IPR petitions filed by RPX were not time-barred under § 315(b).[1] We conclude that it did.
This court has had little occasion to grapple with the meaning of the term "real party in interest" in the context of § 315(b). This is due, in no small part, to the fact that time-bar determinations under this provision were not reviewable until we issued our en banc opinion in Wi-Fi One, LLC v. Broadcom Corporation , 878 F.3d 1364, 1374 (Fed. Cir. 2018) (Wi-Fi En Banc ), holding "that time-bar determinations under § 315(b) are reviewable by this court." On remand, the panel held that "[t]he use of the familiar common law terms 'privy' and 'real party in interest' indicate that Congress intended to adopt common law principles to govern the scope of the [§] 315(b) one-year bar." Wi-Fi One, LLC v. Broadcom Corp. , 887 F.3d 1329, 1335 (Fed. Cir. 2018) ( Wi-Fi Remand ).
Although we have issued a few decisions recently applying these common-law principles in the context of § 315(b) challenges, they have been in cases where privity challenges were raised and where the arguments on that question related to the parties' relationship during an earlier litigation that reached a final judgment; the question of who is a "real party in interest" in the context of an IPR was not addressed.
In the years since the enactment of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 6(a)-(c), 125 Stat. 284, 299-305 (2011) ("AIA"), the PTO has attempted to provide guidance with respect to the meaning of § 315(b) and the terms used therein. Specifically, it has published a Trial Practice Guide discussing these terms.[2] And the PTO's tribunals, *1345 including the Board below, have rendered time-bar determinations involving alleged real parties in interest and privies of petitioners that have relied, to varying degrees, on statements contained in the Trial Practice Guide.
The facts of this case and the arguments made by the parties require us to explore in greater detail the meaning of the term "real party in interest" in the context of the AIA. As such, we first construe § 315(b) by examining the language of the provision, its place in the overall statutory scheme, and the legislative history of the provision. We then explain how the Board in this case rendered a flawed time-bar determination under § 315(b) by taking an unduly narrow view of the meaning of the governing statutory term and by failing to consider the entirety of the record before it.
A. Legal Standards
We review the PTO's statutory interpretations pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ; Auer v. Robbins , 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ; and United States v. Mead , 533 U.S. 218, 229-30, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Chevron requires that a court reviewing an agency's construction of a statute it administers first discern "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. 2778. If the answer is yes, the inquiry ends, and the reviewing court must give effect to Congress's unambiguous intent. Id. at 842-43, 104 S.Ct. 2778. If the answer is no, the court must consider "whether the agency's answer [to the precise question at issue] is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778. The agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." United States v. Eurodif S.A. , 555 U.S. 305, 316, 129 S.Ct. 878, 172 L.Ed.2d 679 (2009) (citing United States v. Mead , 533 U.S. 218, 229-30, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ).
When a statute expressly grants an agency rulemaking authority and does not "unambiguously direct[ ]" the agency to adopt a particular rule, the agency may "enact rules that are reasonable in light of the text, nature, and purpose of the statute." Cuozzo Speed Techs., LLC v. Lee , --- U.S. ----, 136 S.Ct. 2131, 2142, 195 L.Ed.2d 423 (2016) (first citing Mead , 533 U.S. at 229, 121 S.Ct. 2164 ; then citing Chevron , 467 U.S. at 843, 104 S.Ct. 2778 ). In such situations, when the PTO does adopt rules, "[w]e accept the [Director's] interpretation of Patent and Trademark Office regulations unless that interpretation is plainly erroneous or inconsistent with the regulation." In re Sullivan , 362 F.3d 1324, 1326 (Fed. Cir. 2004) (first citing *1346 Auer , 519 U.S. at 461-62, 117 S.Ct. 905 ; then citing Bowles v. Seminole Rock & Sand Co. , 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (internal quotations omitted) ).
Where an agency instead engages in "interpretive" rulemaking, at best, a lower level of deference might apply. See Mead , 533 U.S. at 227-29, 230-31, 121 S.Ct. 2164 (describing notice-and-comment as "significant ... in pointing to Chevron authority"); Reno v. Koray , 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (according "some deference" to an interpretive rule that did "not require notice and comment"). The Supreme Court has explained that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Mead , 533 U.S. at 228, 121 S.Ct. 2164 (footnotes omitted) (citing Skidmore , 323 U.S. at 139-40, 65 S.Ct. 161 ).
B. Interpreting § 315(b)
We begin our analysis of the Board's application of § 315(b) by construing the provision. "As in any case of statutory construction, our analysis begins with the language of the statute." Hughes Aircraft Co. v. Jacobson , 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (internal quotation marks omitted). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " Barnhart v. Sigmon Coal Co. , 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting Robinson v. Shell Oil Co. , 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ). We also "must read the words 'in their context and with a view to their place in the overall statutory scheme.' " King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ). This is because statutory "[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context." Brown v. Gardner , 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). Importantly, we may not conclude that a statutory provision is ambiguous until we conclude that resort to all standard forms of statutory interpretation are incapable of resolving any apparent ambiguity which might appear on the face of the statute. See Chevron , 467 U.S. at 843 n.9, 104 S.Ct. 2778.
The primary dispute in this case is whether the Board applied an unduly narrow test for determining whether Salesforce is a "real party in interest" under § 315(b). We apply the principles set forth in Chevron and its progeny with this dispute in mind.
1. The Common Law in Context
Section 315 governs the relationship between IPRs and other proceedings conducted outside the IPR process. Section 315(b), titled "Patent Owner's Action," provides that an IPR "may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."
Two insights into Congress's intent vis-à-vis the reach of § 315(b) can be gleaned from the statutory text alone. First, the inclusion of the terms "real party in interest" and "privy of the petitioner" in § 315(b) makes clear that Congress planned for the provision to apply broadly-sweeping in not only what might be traditionally known as real parties in interest, but privies as well. Second, Congress *1347 did not speak of there being only one interested party in each case; instead, it chose language that bars petitions where proxies or privies would benefit from an instituted IPR, even where the petitioning party might separately have its own interest in initiating an IPR. Indeed, Congress understood that there could be multiple real parties in interest, as evidenced by § 312(a)'s requirement that an IPR petition must "identif[y] all real parties in interest." 35 U.S.C. § 312(a)(2) (emphasis added).
The terms "real party in interest" and "privy of the petitioner" are not defined in the AIA. As we recognized in Wi-Fi Remand , however, "[t]he use of the familiar common law terms 'privy' and 'real party in interest' indicate that Congress intended to adopt common law principles to govern the scope of the section 315(b) one-year bar." 887 F.3d at 1335 ; see also Kirtsaeng v. John Wiley & Sons, Inc. , 568 U.S. 519, 538, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013) (explaining that, where terms in a statute cover " 'issue[s] previously governed by the common law,' " courts "must presume that 'Congress intended to retain the substance of the common law.' " (quoting Samantar v. Yousuf , 560 U.S. 305, 320 n.13, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) ) ). In WesternGeco LLC v. ION Geophysical Corp. , we shed additional light on the meaning of "privy" in the context of § 315(b), but did not elaborate on the scope of "real party in interest" because the patent owner focused on privity as the key basis of its time-bar challenge. WesternGeco , 889 F.3d 1308, 1316-19 (Fed. Cir. 2018). We now examine the common-law meaning of "real party in interest," keeping in mind the administrative context in which this question arises.
As the Supreme Court explained in Sprint Communications Co. v. APCC Services, Inc. , the concept of a "real party in interest" developed at common law over the centuries in large measure as a means of eliminating a restrictive common law rule that prohibited assignees of a legal claim for money from bringing suit in their own name. 554 U.S. 269, 273-81, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008) ; see also 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 1545 (3d ed. 2018) ("Wright & Miller") ("At common law the assignee of a chose in action did not hold legal title to it and could not qualify as the real party in interest. Indeed, in large measure the real-party-in-interest concept developed as a means of eliminating this restrictive rule." (footnote omitted) ). The Court explained that 17th century English courts "strictly adhered to the rule that a 'chose in action'-an interest in property not immediately reducible to possession (which, over time, came to include a financial interest such as a debt, a legal claim for money, or a contractual right)-simply 'could not be transferred to another person by the strict rules of the ancient common law.' " Sprint Commc'ns , 554 U.S. at 275, 128 S.Ct. 2531 (quoting 2 William Blackstone, Commentaries *442). Over time, "the law increasingly permitted the transfer of legal title to an assignee, [and] courts agreed that assignor and assignee should be treated alike in this respect." Id. at 279-80, 128 S.Ct. 2531.
Federal Rule of Civil Procedure 17(a), titled "Real Party in Interest," codifies these broad, common-law principles. See Wright & Miller § 1541 (explaining that the "original text of Rule 17(a) was taken almost verbatim" from equitable and legal rules that "discarded the cumbersome procedures for 'use' actions at law"). The Rule provides that "[a]n action must be prosecuted in the name of the real party in interest," and specifies seven categories of individuals who "may sue in their own names without joining the person for whose benefit the action is brought": (1)
*1348 executors; (2) administrators; (3) guardians; (4) bailees; (5) trustees of express trusts; (6) parties "with whom or in whose name a contract has been made for another's benefit"; and (7) parties authorized by statute. Fed. R. Civ. P. 17(a). "The list in Rule 17(a) is not meant to be exhaustive and anyone possessing the right to enforce a particular claim is a real party in interest even if that party is not expressly identified in the rule." Wright & Miller § 1543 (emphasis added).
As stated in Wright & Miller, the effect of Rule 17(a)"is that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right ." Id. (emphasis added). Indeed, "[t]he basis for the real-party-in-interest rule was stated by the Advisory Committee in its Note to the 1966 amendment to Rule 17(a)" as follows:
[T]he modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata.
Id. The treatise also notes that, "[i]n order to apply Rule 17(a)(1) properly, it is necessary to identify the law that created the substantive right being asserted by plaintiff." Id.
Two questions we must answer, then, are (1) what "right" is being enforced; and (2) who is "entitled" to enforce that right. In the context of IPRs-adversarial proceedings that offer "a second look at an earlier administrative grant of a patent," Cuozzo , 136 S.Ct. at 2144 -the "right" being enforced is a petitioner's right to seek administrative reexamination of the patentability of issued claims as an alternative to invalidating those claims in a judicial proceeding. Thus, the focus of the real-party-in-interest inquiry is on the patentability of the claims challenged in the IPR petition, bearing in mind who will benefit from having those claims canceled or invalidated.
We now turn to the second question: who is entitled to bring an IPR? Under the provisions of the AIA, "a person who is not the owner of a patent" may petition for IPR, "[s]ubject to the provisions of this chapter." 35 U.S.C. § 311(a). One of these limiting provisions is § 315(b). A second is § 315(a), a related provision that prohibits an IPR from being "instituted if, before the date on which the petition for such a review is filed, the petitioner or real party in interest filed a civil action challenging the validity of a claim of the patent." Other provisions place requirements on the petition itself. See id. §§ 311(b) - (c), 312.
Structurally, the AIA permits the filing of an IPR by anyone who is neither the patent owner nor a petitioner, "real party in interest," or "privy of the petitioner" whose petition would be time-barred under either § 315(a) or § 315(b) from filing an IPR petition. We note that the universe of permissible IPR petitioners seeking to challenge patent claims is significantly larger than the universe of plaintiffs who would have Article III standing to bring a declaratory judgment action challenging the validity of a patent in federal court. The PTO recognizes this unique feature of IPRs, stating in its Trial Practice Guide that "[t]he typical common-law expression of the 'real party-in-interest' (the party 'who, according to the governing substantive law, is entitled to enforce the right') does not fit directly into the AIA trial context" because "[t]hat notion reflects standing concepts, but no such requirement exists in the IPR or PGR context." 77 Fed. Reg. at 48,759. Although we agree with the PTO's assessment, we do not think that this reality renders the meaning of the term "real party in interest" ambiguous in the IPR context.
*1349 As a starting point, Congress clearly did not intend for the term "real party in interest" to be interpreted so broadly as to mean that "anyone who otherwise would be able to petition for IPR" will always be deemed the sole real party in interest. Such an interpretation would render the terms "petitioner" and "privy of the petitioner" in § 315(b) -and § 312(a)'s obligation to identify all real parties in interest-meaningless. It would also render much of § 315(e)'s two estoppel provisions meaningless. These provisions prevent not only petitioners, but also real parties in interest, from requesting or maintaining alternative administrative attacks or asserting subsequent invalidity challenges in federal court "on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. §§ 315(e)(1), (2).[3]
Just how close must the relationship between the real party in interest and the IPR petitioner (or the petition) be? Wright & Miller and other authorities provide examples of legal relationships in which a nonparty is or is not a "real party in interest." Two are particularly relevant in this case. First, "[a]s a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of the principal rather than in the agent's own name." Wright & Miller § 1553. That said, an agent with an ownership interest in the subject matter of the suit, or one who is the trustee of an express trust or a party in whose name a contract has been made for the benefit of another, may qualify as a real party in interest. Id. Second, an incorporated or unincorporated association "is not the appropriate party for bringing suit to assert the personal rights of its members" absent statutory authority to do so. Id. § 1552. "[T]he association may become the real party in interest by acquiring the rights of its members by a bona-fide assignment." Id.
Thus, when it comes to evaluating the relationship between a party bringing a suit and a non-party, the common law seeks to ascertain who, from a "practical and equitable" standpoint, will benefit from the redress that the chosen tribunal might provide. See Trial Practice Guide, 77 Fed. Reg. at 48,759. Indeed, the PTO correctly recognizes that the related concept of privity "is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question ." Id. (emphasis added) (citing 157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl) ).
At the same time, the common law aims to protect defendants in one action from later legal actions brought by related parties who are actually entitled to relief. As stated in Wright & Miller, "[t]he 'negative' function of the rule governing who is a real party in interest enables a defendant to present defenses he has against the real party in interest to protect the defendant *1350 against a subsequent action by the party actually entitled to relief, and to ensure that the judgment will have proper res judicata effect." Wright & Miller § 1543 n.3 (citing Key Constructors, Inc. v. Harnett Cty. , 315 F.R.D. 179, 183 (E.D.N.C. 2016) ). This notion applies with equal force in the IPR context-a patent owner dragged into an IPR by a petitioner, who necessarily has an interest in canceling the patent owner's claims, should not be forced to defend against later judicial or administrative attacks on the same or related grounds by a party that is so closely related to the original petitioner as to qualify as a real party in interest. Section 315(e) is designed to prevent this very possibility by estopping real parties in interest and privies of the petitioner from challenging claims in later judicial or administrative proceedings on any ground that the IPR petitioner raised or reasonably could have raised during the IPR.
2. Legislative History
Turning to the legislative history, we find nothing that suggests Congress intended for the term "real party in interest" to have a meaning that departs from its common-law origins. Instead, it reveals that Congress intended for it to have an expansive formulation. A 2011 House Report on the AIA explains that, "[i]n utilizing the post-grant review process, petitioners, real parties in interest, and their privies are precluded from improperly mounting multiple challenges to a patent or initiating challenges after filing a civil action challenging the validity a claim in the patent." H.R. Rep. No. 112-98, at 48 (2011), reprinted in 2011 U.S.C.C.A.N. 67, 78 (emphasis added). In the following paragraph, the report makes clear that Congress "recognizes the importance of quiet title to patent owners to ensure continued investment resources." Id. Thus, "[w]hile this amendment is intended to remove current disincentives to current administrative processes, the changes made by it are not to be used as tools for harassment or a means to prevent market entry through repeated litigation and administrative attacks on the validity of a patent." Id. (emphases added).
Other statements from members of Congress reveal that the terms "real party in interest" and "privy" were included in § 315 to serve two related purposes: (1) to ensure that third parties who have sufficiently close relationships with IPR petitioners would be bound by the outcome of instituted IPRs under § 315(e), the related IPR estoppel provision; and (2) to safeguard patent owners from having to defend their patents against belated administrative attacks by related parties via § 315(b).
For example, during the March 2011 Senate debates, Senator Kyl stated that "[t]he present bill also incorporates S. 3600's extension of the estoppels and other procedural limits in sections 315 and 325 to real parties in interest and privies of the petitioner." 157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl). He continued that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question ." Id. (emphases added). He then stated that, "[i]deally, extending could-have-raised estoppel to privies will help ensure that if an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed-publications portion of the civil litigation." Id. One of his colleagues, Senator Schumer, expressed a similar belief, stating that "[a] 'privy' is a party that has a direct relationship to the petitioner with respect to the allegedly infringing product or service." Id. at S5432 (Sept. 8, 2011) (statement of Sen. Schumer).
*1351 3. Conclusion Regarding Statutory Interpretation
We conclude that, with respect to the dispute in this case, § 315(b) is unambiguous: Congress intended that the term "real party in interest" have its expansive common-law meaning. Because "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,' " our inquiry ceases and "we need not contemplate deferring to the agency's interpretation." Barnhart , 534 U.S. at 450, 462, 122 S.Ct. 941 (first quoting Robinson , 519 U.S. at 340, 117 S.Ct. 843 ; then quoting Chevron , 467 U.S. at 842-43, 104 S.Ct. 2778 ).
C. The Board Took an Unduly Restrictive View of "Real Party in Interest" and Committed Other Errors
The Board made several critical errors in this case. First, it made certain factual findings that are not supported by substantial evidence and, at various points, failed to consider the entirety of the record. Second, it failed to adhere to the expansive formulation of "real party in interest" that is dictated by the language, structure, purpose, and legislative history of § 315(b).
Determining whether a non-party is a "real party in interest" demands a flexible approach that takes into account both equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner. Indeed, the Trial Practice Guide, on which the Board relied, suggests that the agency understands the "fact-dependent" nature of this inquiry, explaining that the two questions lying at its heart are whether a non-party "desires review of the patent" and whether a petition has been filed at a nonparty's "behest." Trial Practice Guide, 77 Fed. Reg. at 48,759.
Although the Board quoted the portion of the Trial Practice Guide expressing these two questions and the Guide's statement that "multiple factors [are] relevant to the question of whether a non-party may be recognized as" a real party in interest in its institution decision, J.A. 1437, it did not apply these principles in its § 315(b) analysis. For example, the Board did not meaningfully examine two factors the Trial Practice Guide deems "[r]elevant": Salesforce's relationship with RPX and "the nature of" RPX as an entity. 77 Fed. Reg. 48,760. The Trial Practice Guide lists these factors after posing a hypothetical in which a trade association to which "Party A" belongs, "Trade Association X," files an IPR. Although the Guide explains that, "if Trade Association X files an IPR petition, Party A does not become a 'real party-in-interest' or a 'privy' of the Association simply based on its membership in the Association," it also provides that this reality does not mean "that Party A's membership in Trade Association X ... in th[is] scenario[ ] is irrelevant to the determination...." Id. Instead, "deeper consideration of the facts in the particular case is necessary to determine whether Party A is a 'real party-in-interest' or a 'privy' of the petitioner." Id.
We conclude that the Board's consideration of the evidence was impermissibly shallow, both under the Trial Practice Guide and the common law it incorporates. The evidence of record reveals that RPX, unlike a traditional trade association, is a for-profit company whose clients pay for its portfolio of "patent risk solutions." J.A. 73. These solutions help paying members "extricate themselves from NPE lawsuits." J.A. 29. The company's SEC filings reveal that one of its "strategies" for transforming the patent market is "the facilitation of challenges to patent validity," one intent of which is to "reduce expenses for [RPX's] clients." J.A. 31. Yet the Board did not *1352 consider these facts, which, taken together, imply that RPX can and does file IPRs to serve its clients' financial interests, and that a key reason clients pay RPX is to benefit from this practice in the event they are sued by an NPE.
This implication becomes stronger when one considers the discovery produced in this case. First, even though it is undisputed that RPX nominally adhered to its "best practices," which prohibit it from discussing IPRs with clients who do not agree to be named as real parties in interest, J.A. 80, these practices do not bear on whether RPX files IPR petitions to benefit specific clients that previously have been accused of patent infringement. Moreover, several of the factors that RPX considers when identifying potential IPR candidates are highly probative of whether particular individual clients would benefit from having RPX file IPR petitions challenging patents they have been accused of infringing. These include (1) the number of patents "asserted in the campaign"; (2) the likelihood of a new validity challenge by another entity; (3) the number of "RPX clients, including those covered under RPX insurance policies, in suit"; (4) the "estimated cost of litigation defense"; and (5) "potential reputational benefits" to RPX. J.A. 80-81. Each of these factors is suggestive of whether any given RPX client would benefit from having RPX file an IPR petition challenging patents that have been asserted against that client in district court. Yet, again, the Board did not examine these factors, in contravention of its obligations under the Administrative Procedure Act ("APA"). Falkner v. Inglis , 448 F.3d 1357, 1363 (Fed. Cir. 2006) ("This court applies the standards of the Administrative Procedure Act ('APA') in reviewing decisions of the Board." (citation omitted) ).[4]
"[S]ubstantial evidence review 'requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion.' " Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc. , 786 F.3d 960, 970 (Fed. Cir. 2015) (quoting Falkner , 448 F.3d at 1363 ); see Butte Cty. v. Hogen , 613 F.3d 190, 194 (D.C. Cir. 2010) (explaining that an agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications, meaning that the agency must take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches). "Our review under that standard 'can only take place when the agency explains its decisions with sufficient precision, including the underlying factfindings and the agency's rationale.' " Princeton Vanguard , 786 F.3d at 970 (quoting Packard Press, Inc. v. Hewlett-Packard Co. , 227 F.3d 1352, 1357 (Fed. Cir. 2000) ). None of the Board's institution decisions nor its final written decisions grapple with the facts *1353 outlined above, all of which bear directly on the issue of whether, and under what circumstances, RPX takes a particular client's interests into account when determining whether to file IPR petitions. The Board's selective weighing of the record evidence does not pass muster under the APA. "Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it." Id.
The facts and arguments that the Board did consider do not persuade us that its decision not to consider the aforementioned evidence was harmless. First, although there is little evidence regarding RPX's weighing of its "best practices" factors in this case, its Vice President of Client Relations, Chuang, did testify that:
• RPX considered AIT a non-practicing entity, J.A. 1235-36 ¶¶ 35-37;
• "RPX filing [these IPRs] would likely result in positive reputational benefits with the large number of companies (clients and prospects alike) in the software industry," J.A. 1237-38 ¶ 41;
• After Salesforce's CBM petitions were denied, "it was highly unlikely that any party other than RPX would challenge the AIT Patents before the Patent Office unless and until the AIT-Salesforce Litigation was resolved," J.A. 1238-39 ¶ 43; and
• Salesforce was time-barred from challenging the '482 and '111 patents before the PTO, J.A. 1239 ¶ 43.
RPX did not point to any other clients whom it believed might be at risk of infringement claims arising out of the patents on which the IPR was instituted. Indeed, it conceded that no one else would likely have an incentive to challenge these particular patents. It simply cited testimony that its reputation might be boosted by the filing of an IPR which could serve to protect this client. Given that one of RPX's publicly stated business solutions is to file IPRs where its clients have been sued by non-practicing entities to "reduce expenses for [its] clients," J.A. 31, and that any IPR petitions Salesforce might have wanted to file would have been time-barred, this evidence at least suggests that RPX may have filed the three IPR petitions, in part, to benefit Salesforce.
The Board emphasized Chuang's testimony that "[t]he primary factor driving RPX's decision to file [the] IPRs" was "the ability to file a very strong petition against a low quality patent in the software sector before the NPE extracted its price from its first litigation and proceeded to assert the patents more broadly against other targets," which would "prevent multiple future lawsuits against clients, prospects, and the industry at large and, as a result, provide significant reputational benefits to RPX." J.A. 1398. The Board seemed to believe that, so long as RPX articulated an independent interest in pursuing the IPRs, that was enough to make it-and not Salesforce-the real party in interest. But, as discussed above, § 315(b) does not presume the existence of only one real party in interest-it is not an either-or proposition. The point is not to probe RPX's interest (it does not need any); rather, it is to probe the extent to which Salesforce-as RPX's client-has an interest in and will benefit from RPX's actions, and inquire whether RPX can be said to be representing that interest after examining its relationship with Salesforce. The Board's focus on RPX's motivations to the exclusion of Salesforce's reveals its misunderstanding of controlling legal principles.[5]
*1354 A different Board panel recently focused on similar connections between a time-barred party (Springpath) and the nominal petitioner (Cisco) when determining that a petition was barred for failing to identify all real parties in interest. See Cisco Sys., Inc. v. Hewlett Packard Enter. Co. , No. IPR2017-01933 (P.T.A.B. Mar. 16, 2018), Paper No. 9. There, after citing the Trial Practice Guide for the proposition that Boards can take into account "whether a non-party 'funds and directs and controls' an IPR petition or proceeding; the non-party's relationship with the petitioner; the non-party's relationship to the petition itself, including the nature and/or degree of involvement in the filing; and the nature of the entity filing the petition," id. at 13 (citing 77 Fed. Reg. at 48,760 ), the Board found that the patent owner "present[ed] unrebutted evidence that Petitioner invested 34 million dollars into Springpath prior to the filing of the Petition and had attained 'board-level representation' at Springpath-all of which establishes a longstanding relationship between Petitioner and Springpath," id. at 14. According to the Board, "[w]hile this evidence does not show control or funding by Springpath of this IPR, it can be considered as evidence that Cisco is representing Springpath's interest, rather than its own and, thus, it is pursuing its Petition as a proxy for Springpath." Id.
The Board went on to determine that the evidence was "sufficient to demonstrate a proxy relationship such that Cisco was a proxy for Springpath in filing the Petition," crediting the patent owner's assertion that "[i]t is Springpath that is accused of infringing the '799 Patent in the district court litigation, not Cisco," that "Cisco is not, and has never been, a defendant in the Springpath district court litigation," and that "[n]one of Cisco's products have been accused of patent infringement in that litigation." Id. at 15 (citing 77 Fed. Reg. 48,759 for the proposition that a "real party-in-interest" is "the party that desires review of the patent"). Finding that Cisco had failed to explain adequately what "independent reason" it had to file the IPR petition, the Board found it to be a proxy of Springpath. Id. at 16. Here, the Board's failure to consider Salesforce's interest in the IPRs, its decision not to examine critically either RPX's business model, its underestimation of the relevance, in the context presented here, of the fact that Salesforce and RPX had overlapping members on their respective boards of directors, J.A. 1401, and its decision to accept at face value RPX's explanation of its own interest in the IPRs indicates that the Board did not adequately assess whether Salesforce actually "desire[d] review of the patent[s]." 77 Fed. Reg. at 48,759.
Next, the Board relied on Chuang's averment that "RPX did not have any contractual obligation to file [the] IPRs or any 'unwritten,' implicit or covert understanding with Salesforce that it would do so." J.A. 1398 (citation omitted). As explained more fully below, however, a nonparty to an IPR can be a real party in interest even without entering into an express or implied agreement with the petitioner to file an IPR petition.
The Board also cited Chuang's testimony that RPX followed its Best Practices Guide in this case and accordingly "had no communication with Salesforce whatsoever regarding the filing of IPR petitions against the AIT Patents before the AIT IPRs were filed." J.A. 1229 ¶ 20. RPX also submitted evidence that it "did not know before filing the AIT IPRs what (if any) impact an IPR filing would have on RPX's relationship with Salesforce," and that it even considered whether Salesforce might *1355 react negatively to RPX's filing of the IPR petitions. J.A. 1240 ¶ 46. Chuang testified that "defendants often express concern about validity challenges potentially emboldening a plaintiff if unsuccessful or creating conflicts with their litigation strategy," and that RPX did not know what, if any, prior art challenges Salesforce may be planning in the litigation. J.A. 1240 ¶ 46. He further testified that RPX did not have any contractual obligation to file the IPRs or any unwritten, implicit or covert understanding with Salesforce that it would do so. J.A. 1239 ¶ 45.
Chuang did not, however, testify that RPX actually believed Salesforce would have reacted negatively to RPX's filing of IPR petitions challenging claims of the '482 and '111 patents. Rather, the evidence submitted indicates the company's understanding that the very challenges to validity included in the IPR petitions were challenges Salesforce would like to have made if not time-barred from doing so. Indeed, Chuang's own averments about the timing and content of the communications between RPX and Salesforce in relation to the Salesforce litigation and the denied CBM petitions indicate the contrary.[6] The evidence might actually indicate that RPX worked to ascertain, with a strong degree of confidence, its client's desires, while taking last-minute efforts to avoid obtaining an express statement of such desires. The law has a label for this: willful blindness. See Global-Tech Appliances, Inc. v. SEB S.A. , 563 U.S. 754, 769, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) ("While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." (footnote and citation omitted) ).
AIT accused RPX of engaging in this very practice. See J.A. 1368. But the Board, without providing any reasoned explanation, wrote that it was "not persuaded that the evidence of record supports th[e] assertion[s]" that RPX has "adopted a 'willful blindness' strategy" and "intentionally operates its business to circumvent the PTAB's RPI case law." J.A. 1400. It further explained that "RPX has provided declaration testimony that explains RPX's 'best practices' for identifying RPIs that contradicts Patent Owner's assertion." J.A.
*1356 1400 (emphasis added) (citing paragraphs 14-19 of Chuang's declaration). Substantial evidence does not support this determination-nothing in these paragraphs, or anything else in Chuang's declaration or RPX's reply to AIT's preliminary response on real-party-in-interest "contradicts" AIT's theory that RPX filed IPR petitions challenging the two patents asserted in the Salesforce action to benefit Salesforce, where Salesforce itself was time-barred from filing petitions. The insufficiency of the Board's reasoning is especially important because RPX bore the burden of persuasion on this issue, as the Board itself recognized. J.A. 1396-97 (recognizing that, "[w]hen a patent owner provides sufficient evidence prior to institution that reasonably brings into question the accuracy of a petitioner's identification of RPIs, the overall burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all [real parties in interest]." (citing Zerto , No. IPR2014-01295, slip op. at 6-7) ).[7]
In sum, we believe that the Board's determination that Salesforce was not a real party in interest under § 315(b) relied on an impermissibly narrow understanding of the common-law meaning of the term, was not based on consideration of the entirety of the administrative record, and seemingly misallocated the burden of proof. Any one of these errors might warrant vacatur-together, they compel it. The Supreme Court "has stressed the importance of not simply rubber-stamping agency factfinding," explaining that the "APA requires meaningful review" and that "its enactment meant stricter judicial review of agency factfinding than Congress believed some courts had previously conducted." Dickinson v. Zurko , 527 U.S. 150, 162, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (holding that APA standards governing judicial review of agency findings and conclusions apply when the Federal Circuit reviews PTO decisions). At the same time, the Court explained that the APA requires courts to "review[ ] an agency's reasoning to determine whether it is 'arbitrary' or 'capricious.' " Id. at 164, 119 S.Ct. 1816 (citing SEC v. Chenery Corp. , 318 U.S. 80, 89-93, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ). Relying on these principles, we have held that "substantial evidence review 'requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion.' " Princeton Vanguard , 786 F.3d at 970 (quoting Falkner , 448 F.3d at 1363 ). The Board did not consider critical evidence proffered by AIT. Nor did it adequately explain why it rejected certain of AIT's common law theories, particularly where RPX bore the burden of proving its petitions were not time-barred under § 315(b).
Finally, we note that several other legal theories de-scribed in Wright & Miller that were not considered by the Board may apply to the facts of this case. The PTO's rules and Trial Practice Guide expressly reference Wright & Miller as an authority its tribunals should consider when rendering real party-in-interest determinations, and we hold that it was error for the *1357 Board not to have considered these theories, particularly because AIT raised arguments that directly implicate them.[8]
For instance, § 1553 of Wright & Miller explains that, "[a]s a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of the principal rather than in the agent's own name." Wright & Miller § 1553. This section clarifies that an agent with an ownership interest in the subject matter of the suit, or one who is the trustee of an express trust or a party in whose name a contract has been made for the benefit of another, may qualify as a real party in interest. Id. AIT effectively raised this argument below, labeling RPX as "an extension of the client's in-house legal team" that helps "selectively clear" liability for infringement as part of its "patent risk management solutions." J.A. 17. Depending on the nature of the parties' relationship, an entity can serve as an agent to a principal and file an IPR on the principal's behalf even without the two formally agreeing that the agent will do so. See Restatement (Third) of Agency, § 1.01 cmt. c (Am. Law Inst. 2006) ("Thus, a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment."). There is no indication that the Board considered AIT's contention that Salesforce is a real party in interest because RPX acted as its attorney-in-fact or its express or implied litigating agent.
Similarly, a related section of a different treatise discusses "preclusion by consent and estoppel by conduct," beginning with the remark that "[t]he repose and reliance interests generated by a judgment may deserve protection against nonparties for reasons of acquiescence that depart from any of the common 'privity' theories of participation, representation, or property." 18A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 4453 (2d ed. 2018) ("Wright, Miller, & Cooper") (emphasis added). The treatise continues by noting that, "[a]lthough acquiescence furnishes the most apt single label for these reasons, several distinctive principles can be identified." Id. It then provides that:
One, relying on actual consent to be bound, may fairly be treated as an aspect of preclusion by judgment. The others are better viewed as species of apparent authority or estoppel by conduct ; the distinctive feature of these theories is that the apparent authority or estoppel arises from conduct that relates to litigation between other persons. Such conduct may include conduct of a nonparty that apparently authorizes a party to represent his interests; acquiescence in a situation that has been created by a prior judgment; and failure to dispel a party's reasonable belief that the nonparty will honor the judgment in pending litigation.
Id. (emphases added). In this case, AIT argued that RPX had apparent authority to file the IPR petitions to benefit Salesforce, pointing to RPX's public statement that its "interests are 100% aligned with those of [its] clients" and to the timing of Salesforce's substantial payments to RPX. J.A. 20. The Board erred in its § 315(b) analysis by not considering this theory.[9]
*1358 Importantly, we do not question the Board's authority to make findings of fact, or our obligation to defer to those findings when not supported by substantial evidence. Where, however, the Board made its findings without considering the entirety of the evidentiary record, appears to have imposed-even if inadvertently-the burden of proving that RPX was not the only real party in interest on AIT, and assessed the evidence it did consider through an incorrect legal lens, we cannot find that substantial evidence supports the Board's ultimate conclusion.
III. CONCLUSION
For the foregoing reasons, we vacate the Board's 428 and 111 Decision s , and remand for further proceedings. The Board's decisions in this case neither considered the full range of relationships under § 315(b) and the common law that could make Salesforce a real party in interest with respect to this IPR nor properly applied the principles articulated in the Trial Practice Guide upon which it purported to rely. The Board also failed to comply with its obligations under the APA to consider the evidence that justifies and detracts from its conclusions and to explain sufficiently its rationale for rejecting AIT's arguments and theories.
We do not reach the merits of any of the patentability arguments raised in AIT's opening brief. In its discretion, the Board may authorize additional discovery relevant to whether Salesforce is either a real party in interest or a privy of RPX for purposes of § 315(b). Additional discovery may be particularly warranted in the face of the non-frivolous challenge made to date by AIT to RPX's some-what bald assertions regarding who the real parties in interest are in these IPRs.
VACATED AND REMANDED
COSTS
Costs to Applications in Internet Time, LLC.

As stated above, the time-bar arguments that AIT made to the Board centered on a theory that Salesforce was a real party in interest, rather than a privy of RPX. The first time it hinted that it believed Salesforce was a privy of RPX was during the oral hearing, where counsel argued that § 315(b)"merely requires that the real party-in-interest or privy be time barred without speaking of control." J.A. 2024. It then argued in its Notices of Appeal that "the Board lacked authority to proceed in rendering the Final Written Decision because it misconstrued the law of privity and real party in interest." J.A. 298, 303, 308, 484, 489. Because AIT focused its arguments on whether Salesforce was an unnamed real party in interest and because we vacate the Board's determination on that score, we need not address in this opinion whether RPX and Salesforce were in privity, and leave this argument for the Board to consider on remand.

We discuss the Trial Practice Guide in more detail later. We note, however, that the Trial Practice Guide is exactly that and no more. It is "a practice guide" published by the PTO "to advise the public on the general framework of the regulations, including the structure and times for taking action in each of the new proceedings." 77 Fed. Reg. at 48,756. Importantly, it is not binding on Board panel members. Accordingly, it is, at best, " 'entitled to respect' under" Skidmore v. Swift & Co. , 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), "only to the extent that those interpretations have the 'power to persuade'...." Christensen v. Harris Cty. , 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (describing agency manuals and interpretive guidelines as documents that "lack the force of law" and "do not warrant Chevron -style deference," but instead are "entitled to respect" under Skidmore ). We do not pass judgment on the persuasiveness of all aspects of the Trial Practice Guide here, or whether it covers the entirety of the common-law landscape covered by § 315(b). We note that many of the statements in the Trial Practice Guide concerning § 315(b) are consistent with the language, structure, and purpose of the statutory provision it addresses and with its common-law predicates. More particularly, we do not believe that any of the general legal principles expressed in the Trial Practice Guide cited by the Board here run contrary to the common-law understanding of "real party in interest." Our concern here is not with whether the Trial Practice Guide is a thoughtful and useful resource to which individual Board members and the public might turn for guidance-it is-but with this particular panel's understanding and application of the principles articulated therein, and articulated in the common law which the Trial Practice Guide considers.

The legislative history of § 315(e), which we discuss in greater detail below, confirms this view, with one Senator stating:
The present bill also incorporates S. 3600's extension of the estoppels and other procedural limits in sections 315 and 325 to real parties in interest and privies of the petitioner.... [P]rivity is an equitable rule that takes into account the "practical situation," and should extend to parties to transactions and other activities relating to the property in question .
157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl) (emphasis added). Although the second sentence of this Senator's statement only explicitly mentions privity, the common-law rules governing real parties in interest are similarly applicable to parties to transactions and other activities relating to particular property.

We also note that the circumstances surrounding RPX's creation of its Best Practices Guide-none of which the Board considered-cast additional doubt on the company's motivations. On June 5, 2014, a different panel of the Board issued a decision denying institution of an IPR in RPX Corp. v. Virnetx Inc. , explaining why it believed that non-party Apple Inc. was a real party in interest in that case. No. IPR2014-00171 (P.T.A.B. June 5, 2014), Paper No. 49. The Board held that, "based on the record presented, the interactions between RPX and Apple show an implicit authorization to challenge the Virnetx Patent." Id. , slip. op. at 9. Fewer than forty days later, RPX began following its Best Practices Guide, which it claims "help[s] ensure that RPX is complying with all contractual obligations and to ensure that RPX is and will be deemed by the PTAB and district courts as the sole real party-in-interest in all validity challenges unless another real party-in-interest is expressly identified." J.A. 80 (emphases added); id. at 1227 ¶14 (disclosing the date on which the Best Practice Guide was created).

As noted above, the Board never required RPX to assert or prove that "the industry at large" would be impacted by or have an interest in these patents or these IPRs. Thus, even if it were enough for RPX to prove that it had other clients who might benefit from the invalidation of the patents at issue, the Board did not require RPX to prove that to be true.

Chuang testified that "RPX originally looked at the AIT Patents after the AIT-Salesforce Litigation was filed" pursuant to its "customary practice" of monitoring newly filed patent infringement lawsuits to identify suits brought by NPEs. J.A. 1235 ¶¶ 35-36. Moreover, according to Chuang, RPX "most likely" identified the '482 and '111 patents as "good potential IPR candidates that aligned well with the selection criteria" set forth in the Best Practices Guide during a meeting held on February 20, 2015. J.A. 1236-37 ¶¶ 37-40. This was less than three weeks after Salesforce's CBM petitions were denied.
Approximately five weeks after the Board denied Salesforce's CBM petitions, RPX asked Salesforce during a phone call "if Salesforce would like RPX to reach out to AIT to try to obtain information regarding AIT's expectations for its litigation campaign in view of the fact that Salesforce's petition for CBM review had been denied." J.A. 1232 ¶ 27. According to Chuang, Salesforce indicated that it was not interested in having RPX reach out to AIT at that time, but would inform RPX if circumstances changed in the future. J.A. 1232-33 ¶ 27. Finally, in April or May 2015, "Salesforce began to bring up the subject of the AIT-Salesforce Litigation," and "RPX immediately indicated that it was not inclined to discuss that matter, and the topic of discussion turned elsewhere." J.A. 1233 ¶ 28. Had the Board examined any of this evidence, it might have interpreted Salesforce's change of heart and RPX's effort not to acquire any additional information as a mutual desire to avoid entering into an express agreement under which RPX would file IPR petitions challenging AIT's patents for Salesforce's benefit.

This has been and continues to be the Board's position with respect to the placement of the burden of persuasion on this question. See, e.g. , Dep't of Justice v. Iris Corp. Berhad , No. IPR2016-00497, slip op. at 5 (P.T.A.B. Jan. 22, 2018), Paper No. 50 ("The real-party-in-interest and privity requirements are components of a petitioner's case in chief; establishing a failure to meet those requirements is not an affirmative defense on which a patent owner bears the burden."); Atlanta Gas Light Co. v. Bennett Regulator Guards, Inc. , No. IPR2013-00453, slip op. at 68 (P.T.A.B. Jan. 6, 2015), Paper No. 88 ("[T]he burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all the real parties in interest." (emphasis added) ).

While AIT's time-bar arguments below centered on the theory that Salesforce was a real party in interest, rather than a privy of RPX, AIT repeatedly urged that RPX was a "proxy" for Salesforce and raised arguments resting on theories relating thereto. See J.A. 17, 1367-68. On remand, if necessary, the Board must address these other theories focused on the actual relationship between Salesforce and RPX.

In addition, § 1552 of Wright & Miller and § 4456 of Wright, Miller, & Cooper examine the rights of associations, and also appear to be relevant to the undisputed facts of this case.